UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

　　　　　　　　Petitioner,

　vs.

Cedric Brooks,

　　　　　　　　Respondent.　　　　Civ. No. 05-2285 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Government's Petition to Determine Present Mental Condition of an Imprisoned Person under Title 18 U.S.C. §4245. A Hearing on the Petition was conducted on November 10, 2005, at which time, the Respondent appeared by Lyonel Norris, Assistant Federal Defender,[1] and the Government

---

[1] Counsel for the Respondent advised that his client had refused to attend the
(continued...)

appeared by Perry F. Sekus, Assistant United States Attorney.[2]  For reasons which follow, we recommend that the Petition be granted, and that the Respondent be committed to the custody of the Attorney General, and that the Attorney General hospitalize the Respondent at the Federal Medical Center, in Rochester, Minnesota ("FMC-Rochester"), for care and treatment.

## II.  Factual and Procedural Background

The Respondent is a Federal prisoner, who is currently serving a twenty (20) year sentence, which was imposed by the United States District Court for the District of Colorado, following his conviction for money laundering, and aiding and abetting,

---

[1](...continued)
Hearing, or otherwise to confer with him.  Accordingly, the Hearing proceeded without the Respondent in attendance.

[2]At the commencement of the Hearing, counsel for the Respondent renewed his Motion for a Continuance, given that he had reviewed only about two (2) inches of a five (5) inch stack of documents, which were furnished to him, by the Government, on November 4, 2005 -- nearly a week before the Hearing.  We had earlier considered, and denied, by our Order of November 7, 2005, counsel's request for a continuance, and no appeal was taken from that Order.  The Respondent draws no different considerations, than those he had previously raised, as justification for a continuance, and we find none.  Having observed counsel's cross-examination of the single witness that the Government called to testify, we found the examination to be thorough, and competent.  More importantly, to date, counsel has not drawn to our attention any questions, which would have been asked at the Hearing, if a review of all of the Government's disclosures had been completed before that date.

in violation of Title 18 U.S.C. §§1956(a)(1) and 2; and for the distribution of more than 50 grams of cocaine base, in violation of Title 21 U.S.C. §§841(a)(1), and (b)(1)(A). The Respondent's statutory release date is projected for August 15, 2017.

At the time of the Hearing, Dr. Andrew Simcox, who is a licensed psychologist, and a Diplomate of the American Board of Forensic Psychology, which is a specialty of the American Board of Professional Psychology, and who serves as the Chief of Psychology at FMC-Rochester, testified.[3]  Dr. Simcox testified that he has worked on the Respondent's case, and was present at the time of his intake, at FMC-Rochester, on August 11, 2005.  Shortly after the Respondent's admission to the Center, Dr. Simcox decided to petition for medical treatment.  Dr. Susan Carroll, who is a staff psychiatrist at FMC-Rochester, has been assigned to the Respondent's case.  As related by Dr. Simcox, the Respondent was transferred to FMC-Rochester, from FCI-Oxford, in Wisconsin.

---

[3]The Respondent stipulated to Dr. Simcox's expertise, and we concur in the view that he has the requisite training, education, and experience, to offer psychological diagnoses, prognoses, and opinions.  See, Government Exhibit 1.  In addition, Dr. Simcox's Mental Health Evaluation of the Respondent, which is dated September 1, 2005, was admitted without objection.  See, Government Exhibit 2.

Dr. Simcox testified that he has a good relationship with the psychological staff at FCI-Oxford, who had conferred with him about the Respondent's mental state. Apparently, the Respondent was not causing problems at FCI-Oxford, but the staff, there, was concerned because the Respondent appeared to be wasting away. He was anti-social, he had no roommates, he was disinterested in interacting with the staff, and he resided in a locked housing unit. The staff at FCI-Oxford stated that they would not ordinarily refer such an inmate to FMC-Rochester, but Dr. Simcox encouraged them to do so. Following his assessment of the Respondent, as well of that of the FMC-Rochester Psychology Department, Dr. Simcox assisted in preparing a Mental Health Evaluation of the Respondent. See, Government Exhibit 2. The principal diagnosis of the Respondent, which was drawn at the end of that evaluation, was that he was suffering from a Psychotic Disorder Not Otherwise Specified[4] ("Psychotic

---

[4]As explained by Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"), at p. 343:

> [Psychotic Disorder NOS] includes psychosis symptoma-tology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the
>
> (continued...)

Disorder NOS"), but with the additional caveat to rule out Schizophrenia, Undifferenti-

ated Type.[5]

Dr. Simcox related that such a diagnosis was appropriate because, at the time

that the Respondent's Mental Health Evaluation was written, the staff could not rule

out medical causes for his symptomatology, and it was unclear as to the duration of

those symptoms.   Dr. Simcox asserted that the Respondent had been displaying

behavioral characteristics that were of psychological concern, such as experiencing

delusional ideas -- that is, the expression of fixed beliefs that are illogical.   Dr. Simcox

quoted the Respondent as stating that his sentence was about to expire, even though

it would not expire until his release date in 2017.   The Respondent would express the

belief that attorneys owned the Bureau of Prisons, that he was the victim of

---

[4](...continued)
         criteria for any specific Psychotic Disorder.

[5]DSM-IV-TR, at p. 316, defines Schizophrenia, Undifferentiated Type as follows:

> A type of Schizophrenia in which symptoms that meet
> Criterion A are present (i.e., two or more of the following
> characteristic symptoms: delusions, hallucinations,
> disorganized speech, grossly disorganized or catatonic
> behavior, and negative symptoms such as affective
> flattening, an inability to speak, or lack of motivation),but
> that do not meet the criteria for Paranoid, Disorganized, or
> Catatonic Type.

discrimination, and that he had experienced unusual incursions, by prison staff, as to his privacy -- namely, that prison officials had touched his private parts.  Although the Respondent had not claimed to have been hearing voices, he talked loudly to himself, which suggested to staff that he was hallucinating.

Dr. Simcox also described the Respondent as exhibiting disorganization in his thinking and behavior, because he could not engage in a lengthy conversation, nor could he stay on topic or intelligibly answer a question.  Further, the Respondent has frequently been the recipient of discipline for conduct that went outside of bounds. He had fifty (50) disciplinary incidents, which resulted in his spending one half of his imprisonment, to date, in a Special Housing Unit ("SHU"), which involved a lock-down status.  The Respondent has experienced a general decline in functioning, as well as in his activities of daily living.  He refuses all recreation, has gone for extended periods without bathing or eating, he does not socialize, and his recent weight of one hundred and twenty (120) pounds, for his five (5) foot, eight (8) inch frame, is the lowest weight he has recorded.

For daily activities, the Respondent lies in bed all day, and only eats a small portion of his meals.  Nevertheless, when questioned about his health, the Respondent would peek out of his blankets and simply say that he was "okay."  Dr. Simcox has

offered to escort the Respondent to a television watching area, which he had previously done on a prior occasion, but which he now refuses. Given the extent of his disciplinary citations, the Respondent is in a locked housing unit, which has three unfortunate consequences. First, being in locked housing deprives the Respondent of socialization and, second, over the course of his incarceration, has caused him to be transferred to prison facilities with an increased security level, such as USP-Leavenworth. Lastly, the Respondent's discipline has caused him to lose good time credit. According to Dr. Simcox, given the length of the Respondent's sentence, he has the opportunity of earning fifty-five (55) days of good time credit per year, but that credit has been lost as a disciplinary punishment. Accordingly, the Respondent's incident reports have had a detrimental effect on him even though, in Dr. Simcox's assessment, those incident reports are the likely effect of the Respondent's mental illness.

Some of the discipline, that the Respondent has suffered, relates to his refusing to be searched, his insolence to prison officials, or his refusal to work. Simply put, Dr. Simcox felt that such incidents were attributable to the Respondent's inability to perceive boundaries correctly. Dr. Simcox felt that the Respondent could be able to have some of the good time credit retroactively restored, because it was the product

of his mental illness.  While Dr. Simcox acknowledged that such restoration was the exception, and not the rule, if the Respondent was not competent because of mental illness, then restoration could be given.   In this respect, Dr. Simcox described the Respondent as being "quietly mentally ill," because he did not routinely display extremely bizarre behavior but, in Dr. Simcox's view, he has been suffering from psychosis for some time, but neither the Respondent, nor prior prison staff, have realized that fact.  The Respondent does not flood his cell, and he is generally polite to prison staff, such that his mental illness has not resulted in any finding of incompetency at any Disciplinary Hearing.

Nonetheless, on a continuum of mental health, extending from mild psychotic symptoms to drastically severe mental illness, Dr. Simcox concluded that the Respondent would be located at the severe end, as Dr. Simcox opines that the Respondent has experienced catatonia, he isolates himself, and his refusal to eat has resulted in his emaciated state.  Dr. Simcox opined that the Respondent is "seriously mentally ill."  As recounted by Dr. Simcox, Dr. Carroll became worried because the Respondent was not getting out of bed, nor was he eating much.  She placed the Respondent on a suicide watch, and considered the Respondent to be either catatonic, or experiencing an embolism.  As a result, Dr. Carroll resorted to emergency

measures, including the conduct of a laboratory work up, and the administration of psychotropic medicines, including Ativan, which is employed as a muscle relaxer, or as an anti-anxiety drug; Haldol, which is an antipsychotic; and Cogentin, which is administered to treat certain of the side effects of Haldol. According to Dr. Simcox, the emergency treatment was not prescribed because the Respondent was a threat to others, or because he was an immediate threat to himself. While the Respondent is not viewed as being suicidal, he confronts a risk of suicide, shared with other psychotics, who experience a one (1) in ten (10) rate of suicide.

Dr. Simcox observed that the Mental Health Evaluation of the Respondent was drafted on September 1, 2005, and was signed by the staff members, who were involved in the Respondent's assessment, on September 9, 2005. Between that time, and the time of the Hearing, Dr. Simcox, and the psychological staff at FMC-Rochester, have had a further opportunity to evaluate the Respondent, and they have modified their initial diagnosis somewhat. Given the laboratory results, which were emergently secured by Dr. Carroll, there does not appear to be any obvious physical cause for the Respondent's symptoms, but additional medical testing would be required in order to more responsibly make such an assessment.

Dr. Simcox testified that he has now diagnosed the Respondent with Schizophrenia, Undifferentiated Type, as his symptoms appear to have extended for at least six (6) months.  While the staff at FMC-Rochester have not had six (6) months to observe the Respondent, they do have his records from FCI-Oxford, which describe a course of conduct, on the Respondent's part, which parallels that observed by the staff at FMC-Rochester.  Dr. Simcox acknowledged that Schizophrenia is ordinarily observed before a patient reaches the age of 30 -- and the Respondent is now 33 years old -- but the doctor could not exclude the possibility that the Respondent had been suffering from that mental illness for some period of time, without the illness having been diagnosed.  As related by Dr. Simcox, the psychological staff at FMC-Rochester, who have been involved in the assessment of the Respondent, concur in Dr. Simcox's current diagnosis.

In Dr. Simcox's psychological judgment, which he holds to a reasonable degree of certainty, the Respondent suffers from a sever psychotic disorder that is in need of treatment.  The treatment is required in order to ensure the Respondent's safety, as well as his integration into prison society.  If allowed to treat the Respondent, the staff at FMC-Rochester would provide medications to the Respondent in conjunction with individual and group therapy.  While Dr. Simcox acknowledged that it was difficult to

know how the Respondent would respond to treatment, because he has not obtained treatment previously, except on a brief, emergent basis, most persons suffering from the Respondent's mental illness obtain great relief, and substantially benefit from the treatment. Dr. Simcox noted that most inmates, who are referred to FMC-Rochester, suffer from a psychotic illness, and most get relief within a matter of months.

Dr. Simcox also expressed his professional opinion that the Respondent could not be adequately treated in a normal prison setting, as the ordinary prison approach would manage him by locking him in a cell. FMC-Rochester has full-time psychologists, and staff, who assist in individual and group therapy sessions. Moreover, FMC-Rochester has flexibility in its housing options so as to accommodate the Respondent's changing housing needs. In Dr. Simcox's view, FMC-Rochester is an appropriate facility for the treatment of the Respondent, and the psychological opinions that the doctor expressed are held to a reasonable degree of certainty.

On cross-examination, Dr. Simcox acknowledged that the Respondent has confronted, and will confront, an extended period of incarceration. He was twenty-two (22) years old when he started to serve his sentence, and he is currently thirty-three (33) years old. So, after having served ten (10) years of imprisonment, the Respondent faces an additional twelve (12) years of incarceration. Such an extended

period of confinement can be depressing, given the fact that the Respondent will spend much of his adult life in prison. While serving such a sentence could be a "shockingly depressing event," Dr. Simcox testified that he has interacted with many young men in comparable circumstances and, even in that group, the Respondent's current state would stand out. Some of those persons would be withdrawn, or loners, but the Respondent's background did not support a conclusion that he would be that type of person. Even though it is not an "odd reaction" for a prisoner to lose interest in socializing, Dr. Simcox believed that the Respondent's reaction was abnormal.

Dr. Simcox also conceded that the Respondent believes that he has been discriminated against, and such a belief can be delusional, but Dr. Simcox did not observe the  treatment of the Respondent at FCI-Oxford, or USP-Leavenworth, and cannot exclude the possibility that the Respondent truly was the victim of discrimination. Dr. Simcox noted, however, that the Respondent contended that several prison officials had touched his private parts, but an investigation uncovered no wrong. When questioned as to whether he had ever conversed with himself, Dr. Simcox responded that he did so internally, but not out loud. However, in the Respondent's case, the Respondent rambles incoherently out loud, and in a fashion where the listener is unable to decipher what is being said. This conduct has been documented in the

nurse's notes, but has not occurred in recent weeks when the Respondent has become more withdrawn, and has remained in his bed.

Dr. Simcox also readily admitted that, while he attributed some of the Respondent's disciplinary conduct to incipient mental illness, it is not unusual to have fighting in a prison, to have a prisoner be absent from work, or refuse the orders of prison staff. Insolence, as well, is a common incident report. Although some prisoners just do not care, most know not to cross boundaries set by the prison guards, as the guards give some leeway. However, in the Respondent's case, there is a big difference between FMC-Rochester, and USP-Leavenworth, so he should be expected to do that which will keep him at FMC-Rochester. The difference is between doing hard time, and just doing time, and inmates who are compliant with the rules have open units, good in-prison jobs, less security, and better rewards. While some prisoners may prefer a secured facility, rather than the dorm-like setting of lower security units, such is not the norm.

When asked to address the Respondent's Global Assessment of Function ("GAF"), Dr. Simcox explained that the score is intended to measure a person's overall ability to function normally, and the willingness to do so. In the Respondent's instance, the staff had not previously addressed the Respondent's GAF and, when

asked by counsel for the Respondent to do so, Dr. Simcox consulted with the
Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision
( DSM-IV-TR), and opined that the Respondent had a GAF of 30, when the highest
GAF -- which reflects superior functioning, without symptoms -- is 100.  As detailed
in the DSM-IV-TR at p. 34, a GAF of 30 reflects "[b]ehavior [that] is considerably
influenced by delusions or hallucinations OR serious impairment in communication or
judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal
preoccupation) OR inability to function in almost all areas (i.e., stays in bed all day;
no job, home, or friends)."

Dr. Simcox testified that, generally speaking, the Respondent is polite and not
aggressive; he does not bother anyone, and he wants reciprocity; and, while he eats
some each day, his portions are self-limited, and he does not explain why he is not
eating.  The prison staff wants to increase the Respondent's weight to one hundred
and thirty (130) pounds.  At times, the Respondent has been catatonic, when the
Respondent sits motionless, or in an odd position, for extended periods of time.
Although some prisoners occasionally spend time lying on a bed, in the Respondent's
instance, he stays in bed day and night and, when he is motionless for ten (10) to (12)

- 14 -

hours, it could be more than merely sleeping.  On such occasions, he refuses to get out of bed to eat, and does not respond to staff when they are speaking to him.

In Dr. Simcox's view, the Respondent has not again experienced catatonia since he was emergently medicated.  In the week prior to that medication -- which was during the last week of September -- he was catatonic and that triggered the medication.  More precisely, the Respondent was emergently medicated on September 29, 2005.  The medications were short acting and, to date, the Respondent has not experienced any more episodes where he has gone many shifts without eating.  Nonetheless, there is concern about the Respondent's long-term safety, as he is more prone to suicide than the normal population.  Even so, Dr. Simcox acknowledged that, to the knowledge of the Center's staff, the Respondent has not attempted to commit suicide.

Dr. Simcox also acknowledged that there are a "constellation of behaviors" which are only suggestive of psychological problems and, while there could be non-psychotic explanations for some of the Respondent's symptoms, the Respondent has declined a more formal assessment to determine if his symptoms have a physical basis.  The symptoms could be suggestive of a brain tumor but, without a formal assessment, such a nexus is only theoretical.  Moreover, it is a fair assessment to say that the

Respondent has not previously been diagnosed with a mental illness at any prior prison facility, but the Respondent was not a "squeaky wheel."   According to Dr. Simcox, the Respondent's "constellation of symptoms" reflects a psychosis, given the Respondent's "pre-morbid activities" -- people, such as the Respondent, have not previously joined a gang to be solitary.

Dr. Simcox was also cross-examined on his most recent diagnosis of the Respondent's condition.   Unlike Schizophrenia, a Psychic Disorder NOS need not extend for six (6) months or more.   Schizophrenia is a condition of longer duration, and is not a curable illness, although intermittent treatment will push the symptoms into remission.   The administration of antipsychotic medications will get the condition under control, for Schizophrenia is a chemical issue, as the brain is not functioning well in the absence of certain chemicals.   In the Respondent's case, Dr. Simcox was not aware of any family history of mental illness.   Dr. Simcox also rejected the notion that prison life caused mental illness, although a prison sentence is not good for the inmate's mental health.   Mental illness is not contagious.

On redirect, Dr. Simcox noted that talking to one's self is not, in and of itself, a sign of mental illness, but it is a "red flag."   As to the Respondent, Dr. Simcox believes that his talking to himself is an expression of his hallucinations.   Since 1987,

Dr. Simcox has worked around prisoners, and he has observed inmates who are insolent, and who hate being in prison, but the Respondent's symptoms, and actions, are different and are a cause for concern.   While a brain tumor could be causing the Respondent's symptoms, he does not demonstrate, for example, an uneven gait which would suggest such a condition.   In any event, even if such a physical illness were present, the Respondent would still need treatment for his mental illness as, untreated, he would refuse to undergo the type of clinical and laboratory tests which would uncover a physical source of the problem.   Lastly, Dr. Simcox fully explained to the Respondent that he could attend the Hearing, and the Respondent understood that the Hearing would afford the Respondent an opportunity to speak directly to the Court.

On re-cross, and redirect, Dr. Simcox noted that, in the past, the Respondent had been described, by one prison staff or another, as not exhibiting the severe signs of psychosis, in conjunction with assessments as to whether the Respondent should remain in a locked SHU environment.   However, the doctor expressed his disagreement with those assessments, as they were not as detailed and extended as the assessment that the Respondent has undergone at FMC-Rochester.   While Dr. Simcox could not exclude the possibility that those earlier assessments may have been accurate, he also could not exclude the possibility that the psychological staff simply

accepted, at face value, the Respondent's statement that he was okay.  As recounted by Dr. Simcox, given his experience with the Respondent, it would be easy for a psychologist to walk by his cell and not detect a problem.  As Dr. Simcox described it, when you try to get the Respondent engaged, he simply responds that he is fine but, when he is engaged, he speaks unorganized thoughts.

III.  <u>Discussion</u>

A.    <u>Standard of Review</u>.  In response to <u>Vitek v. Jones</u>, 445 U.S. 480 (1980), in which the Supreme Court held that the Due Process Clause forbids the involuntary transfer of a State prisoner to a mental hospital without a Court Hearing, Congress enacted Title 18 U.S.C. §4245.  Section 4245 ensures the exercise of judicial oversight concerning the involuntary transfer of prisoners from a Federal prison to a mental hospital, in order to "adequately safeguard the fundamental rights of the prisoner." <u>Continuing Appropriations, 1985--Comprehensive Crime Control Act of 1984</u>, H.R.Rep. No. 98-1030, 98th Cong., 2d Sess. (1984), reprinted in 1984 <u>U.S.Code Cong. & Admin.News</u> 3430.

As promulgated, Section 4245 allows the transfer of a Federal prisoner to a mental hospital for care or treatment, only with the prisoner's consent, or a Court Order.  See, <u>United States v. Horne</u>, 955 F. Supp. 1141, 1143 (D. Minn. 1997), citing

United States v. Watson, 893 F.2d 970, 975 (8th Cir. 1990), vacated in part on other grounds sub nom., United States v. Holmes, 900 F.2d 1322 (8th Cir. 1990), cert. denied, 497 U.S. 1006 (1990).[6]  If the prisoner does not consent to being relocated to a "suitable facility for care or treatment," however, the Government may move the Court, in the District in which the facility is located, for a Hearing on the prisoner's present mental condition.  Title 18 U.S.C. §4245(a).  The Hearing, in which the prisoner is afforded the right to counsel, see, Title 18 U.S.C. §4247(d), is to determine whether there is "reasonable cause to believe that the person may be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility."  Id.; see also, United States v. Bean, 373 F.3d 877, 879 (8th Cir. 2004).

The Statute provides that, prior to the Hearing, the Court may direct that a psychiatric or psychological examination of the person be conducted, in order that a report of that examination may be filed with the Court.  Title 18 U.S.C. §4245(b).  "If,

---

[6]We have found no case in which our Court of Appeals has addressed the standards which apply under Section 4245, although the Court, in United States v. Eckerson, 299 F.3d 913, 914 (8th Cir. 2002), did reference the standard enunciated in United States v. Horne, 955 F. Supp. 1141, 1147 (D. Minn. 1997).  However, in Eckerson, the standard, as adopted in Horne, had not been challenged by any party, and that issue was, therefore, not squarely before the Court.

after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General." Title 18 U.S.C. §4245(d); see also, United States v. Bean, supra at 879.  If such a finding is made, the Government shall hospitalize the prisoner "for treatment in a suitable facility until he is no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier." Id.; see also, United States v. Epps, 95 Fed.Appx. 202, 2004 WL 878462 at *1 (8th Cir., April 26, 2004).

As a Court in this District has explained, the Statute requires the reviewing Court to answer three questions:  "Is the Respondent suffering from a mental disease or defect; [i]f so, is the Respondent in need of custody for care or treatment of that disease or defect; [and,] [i]f so, is the proposed facility a suitable facility?" United States v. Horne, supra at 1144; see also, United States v. Washington, 2005 WL 1277778 at *2 (D. Minn., May 11, 2005), aff'd, 2005 WL 1387597 (D. Minn., June 10, 2005).  We address those same questions with the benefit of the totality of the Record presented.

B.    <u>Legal Analysis</u>.  Having carefully weighed the testimony presented at the Hearing, and the Exhibits admitted, we conclude that a preponderance of the evidence establishes that the Respondent is currently suffering from a mental disease or defect, and is in need of custody for the care and treatment of that mental condition, for which FMC-Rochester is a suitable facility to administer that care and treatment.

1.    <u>Does the Respondent Currently Suffer from a<br>Mental Disease or Defect</u>?

Although Section 4245 does not expressly define what constitutes a "mental disease or defect," the plain meaning of that phrase most certainly encompasses either a Psychotic Disorder NOS, or Schizophrenia, Undifferentiated Type.  Courts in this District have so held.  See, <u>United States v. Washington</u>, 2005 WL 1387597 at *1 (D. Minn., June 10, 2005)(Psychotic Disorder NOS); <u>United States v. Bryant</u>, 2005 WL 388612 (D. Minn., February 15, 2005)(same); <u>United States v. LeClair</u>, 2002 WL 1156020 at * (D. Minn., May 28, 2002), aff'd, 338 F.3d 882 (8th Cir. 2003)(Schizophrenia, Undifferentiated Type); <u>United States v. Wedington</u>, 2005 WL 1270915 at *2 (D. Minn., May 26, 2005)(same); see also, <u>United States v. Eckerson</u>, 299 F.3d 913, 914 (8th Cir. 2002)(same).  Moreover, both diagnoses are

defined in the <u>DSM-IV-TR</u> as mental disorders.   See, <u>DSM-IV-TR</u>, at pp. 316 and 343.

Nor do we have any hesitation in finding, by a great preponderance of the evidence, that the Respondent currently suffers from that mental disorder.   We find that Dr. Simcox's testimony, and clinical opinions, to be competent, informed, and wholly credible.   The Respondent has exhibited, within the period of his stay at FMC-Rochester, the clinical signs of both diagnoses and, of late, the clinical signs of Schizophrenia, Undifferentiated Type.   He has delusions; hallucinations that are expressed in his loud, incoherent talks with himself; disorganized thoughts and communications; grossly disorganized or catatonic behavior, and a disinterest in socializing or interacting with others.   As reflected by Dr. Simcox's testimony, which is unrebutted, those symptoms have persisted for at least six (6) months or more.   The Respondent does not eat much; he is becoming emaciated; he does not shower or bathe regularly; he refuses recreation of any sort; he is self-restricted to his bed; and he cannot be effectively engaged in meaningful interaction with staff members.   Those clinical symptoms are not controverted in any respect.

While we understand the Respondent, through counsel, to suggest that the same symptoms are reflective of prison life and, particularly so, when the inmate faces a

long term of imprisonment, the "constellation" of the Respondent's symptoms does not support such an hypothesis. Dr. Simcox has interacted with prison inmates for nearly two (2) decades, and he assesses the Respondent's current mental state as abnormal, even in comparison to prisoners who are, or have been, similarly situated. While one inmate may be withdrawn, insolent, or disinterested in working, that same inmate may not be emaciated from self-limiting his or her intake of food, or not be so withdrawn as to be catatonic. We find Dr. Simcox's experience, over the past near score of years, in assessing the mental well being and treatment needs of prisoners, to be convincing and we are satisfied that his assessment -- that the Respondent is suffering from a severe psychotic illness -- is accurate.

Nor can be overlook the fact that the Respondent's illness has had severely detrimental effects on him. He is not only emaciated from loss of body weight, but he refuses any medical assessment which might disclose other infirmities that are hazardous to the Respondent's long-term well being. His disciplinary history has resulted in losses of good time credit which, effectively, has extended the actual term of his imprisonment. Given his current mental state, the Respondent is incapable of altering this past history. While it is unfortunate that the Respondent has been the victim of a silent, or quiet, mental illness, the simple fact is that, given that illness, he

- 23 -

has spent fully one-half of his incarceration, to date, in lock-down housing.  To allow such a circumstance to continue is not only psychologically and medically unwise, it is starkly inhuman.

      2.      <u>Is the Mental Disease or Defect in Need of Care and Treatment</u>?

As we have detailed, Section 4245(d) requires the Respondent to establish that, because the Respondent suffers from a mental disease or defect, he is "in need" of care and treatment in a custodial setting.  Once again, the testimony of Dr. Simcox, as to the pressing need for treatment and care, has been unrebutted.  While the emergent treatment of the Respondent was focalized, and abbreviated by its circumstance, it appears to have brought the Respondent relief from his catatonic state -- a state that has not returned.  No adverse side-effects from that emergent treatment have been drawn to our attention, and Dr. Simcox makes the critical point that, even if the Respondent suffers from other physical ailments, which aggravate his symptomatology, without the treatment now being prescribed for him, the Respondent would not allow the clinical evaluations that would be essential to the treatment of such physical illnesses.

To be sure, the treatment of the Respondent's mental disease or defect is not guaranteed to succeed, for few treatment modalities enjoy such certainty, but Dr. Simcox has administered the same course of treatment to others, who were similarly afflicted with the same symptoms, and the majority found relief, and psychological improvement.  Dr. Simcox is confident that the prescribed course of treatment for the Respondent will garner the same results, and we are presented with no differing clinical, or professional view.

Lastly, there can be no doubt, on the totality of this Record, that the Respondent needs the prescribed treatment to alleviate the debilitating symptoms that he currently experiences.  Going into near total isolation, with minimal sustenance because of self-limits, does not bode well for the Respondent's future and, in fact, has resulted in his current emaciated state.  Without the ability to communicate intelligibly, to interact responsibly, and to integrate with one's surroundings, the Respondent will unnecessarily increase his sentence of imprisonment, only because he is unable, on his own, to take advantage of the treatments which have been designed to counteract his psychotic disease.  Without such treatment, the opportunity for the Respondent to gain a release to the general population appears remote, as does his potential to participate in jobs, recreation, or any other rehabilitative process, which would be

available to him in the prison setting. Therefore, given the overwhelming evidence presented, we find and conclude that the Respondent is in need of custodial care and treatment for his Schizophrenia, Undifferentiated Type.

      3. <u>Is FMC-Rochester a Suitable Facility for the Administration of the Respondent's Care and Treatment</u>?

A "suitable facility" is defined, somewhat tautologically, as one "that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant." <u>Title 18 U.S.C. §4247(a)(2)</u>. Dr. Simcox testified that FMC-Rochester is suitable for the Respondent's custodial care, and that an ordinary Federal Correctional Institution would not be suitable. FMC-Rochester has a full time psychological department, with trained and experienced psychologists, psychiatrists, and staff, who can knowledgeably administer the antipsychotic medications, and engage in the individualized and group therapy that the Respondent needs. If, as Dr. Simcox projects, the Respondent's mental state improves, then FMC-Rochester has the flexibility to provide the Respondent with housing facilities which will further advance his treatment, as opposed to the lock-down facilities that have, in practical effect, served as his treatment over the past decade of his sentence. There is nothing in the Record which counters Dr. Simcox's opinion as to the

suitability of FMC-Rochester, which he expressed to a reasonable degree of certainty, and we find and conclude that FMC-Rochester is a suitable facility for the Respondent to receive his custodial care and/or treatment.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Petition to Determine Present Medical Condition of an Imprisoned Person under Title 18 U.S.C. §4245 [Docket No. 1] be granted.

2.     That the Respondent be committed to the custody of the United States Attorney General, who shall hospitalize him for treatment and care at FMC-Rochester until he is no longer in need of such custody for care or treatment, or until the expiration of the sentence of imprisonment, whichever occurs earlier.

Dated:  November 18, 2005                          s/Raymond L. Erickson

                                                    Raymond L. Erickson
                                                    CHIEF U.S. MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 6, 2005,** a writing which specifically identifies those portions of the Report to which objections are made and the bases for those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of the Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 6, 2005,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.